You may be seated. This is our first case in the morning. Baker v. BK Promotions for the appellant, Mr. Cate, Mr. Atterbury, Ms. Lawless, and I believe Ms. Kendall. You all going to speak? Yes, sir. You've divided your time? Yes, sir. You may proceed. May it please the court, counsel. My name is Matthew Cates. I'm here on behalf of the appellant in this matter, Robert Baker. As this court is aware, each of the appellants in this matter were spectators at an auto race over at the Wharton County Speedway in Wharton County, Illinois. There was a horrific accident, which a car left the tracks, left the tracks, ended up in the crowd. Each of our clients received injuries thereof. Now, prior to that, each of them signed releases and waivers of liability. As the court is well aware, these type of releases can be enforced in Illinois. Absolutely. We don't dispute that. However, they'll be construed against the drafter, that'd be the appellate's. There's ambiguity contained within the waivers in question in two different areas. The first clear area of that is that the laundry list of activities that are involved, reciting compete, officiate, observe, work, or participate in any way. The language I'm going to focus on there would be the participate in any way. What they have is a laundry list of activities. Why are you skipping observe? The reason being, Judge, is when you end with a participate in any way, it's qualifying the prior words in the sense that any other type of participation, the list of activities there, although observe is among them in the center, the list of activities would be one that a normal, reasonable person would equate with someone participating. For example, in the pit crew, driving the car, officiating. But doesn't this construction of the release have the effect of eliminating the word observe? Not eliminating it, just equating it to the observation as a participant. And that's part of the problem, Judge, is taking the situation in which a reasonable person having to view a release like this, and we're not arguing any type of fraud in the inducement or fraud in the execution or something like that, but taking a reasonable person going through this release, reading through it, what are they doing? What is that activity that they are now giving up or releasing in that sense? And that's why the focus should be on what they could have been doing to draft that more clearly. It should have been set off. It should have been set off in the sense that, okay, here's what, you know, participating. Separate paragraph or something talking about observation. They're trying to do a kind of a catch-all. So by far, this comprehensive clause being unclear, they would have stopped at the gate and said, oh, I'm sorry. Hey, now that I understand that, I'm leaving. Possibly. Most people wouldn't. I agree with you. So you think that would have happened in this case? Judge, probably not, but we don't know that situation. And maybe it wouldn't be the Robert Baker. Maybe it wouldn't be the John Smith. But maybe it would be Jane Doe, who had never been to a race before, who had never been to one before, and that's what they're going to catch also. Other than your argument that the word observe should be qualified as observe as a participant, was there some other problem with this release? Absolutely, Judge. The other main area of this is that the restricted areas. That's what they want to catch next is, okay, so define where this is. Define what we're talking about, and that's to requiring special authorization credentials or permission to enter or any area in which admission by the general public is restricted or prohibited. There is a very easy one, and that's what going through the depositions of each of the plans, the depositions that were all involved in this. No one was quite sure where they were at. I mean, generally, maybe this was restricted, maybe this wasn't. Keep in mind, this one isn't where you buy the passes. If the opposite end from the pits, the right way to know where a restricted area is, there's a sign-up that says restricted area, credentials necessary, anything like that. Was there in this case? Absolutely not. So the problem wasn't with the release. It was with the absence of the sign? Well, when you equate it with the release, well, I'm just equating that, Judge, when it says... So if the sign had been up, there would be no problem with this language in the release? It would possibly make the... Other than the private's arguments, it could possibly make the release. And, of course, that's after the release was signed anyway, isn't it? True, Judge, but keep in mind their language from it. Their language is... I'm just saying that they needed to be doing something where it puts... So how does this make any difference at the moment that the release is signed, whether there was going to be a sign-up or not? To know where the restricted area was. Well, is there some claim that people were coming in and out of this restricted area inadvertently? We don't know that, Judge, and that's the thing. They want to point to... Well, my question is, is there some claim that that's what happened in this case or that there's any evidence to support it? Yes. Appellees have wanted to point to that only the plaintiffs saw people with wristbands there. Okay. But there is nothing blocking the general public from getting down there also. This is just an opening. There wasn't, like, a gate or a turnstile or anything like that which would show the order of the general public being prohibited. It's just an opening, Your Honors. The Morgan County Speedway, it's simply an area in front of the normal grandstand, and it's an opening. You go through it. There's nothing equating to how do you know you're in this restricted area? How do you know that? And that's where you equate... I'm not saying it has to be a sign, Judge. It could be a person. It could be anything that puts them of notice, okay, we're in the restricted area now. That's how the release would work. That's how they chose to have it work. Another way, I suppose, would have been to have a map on this. Show here's the layout of the Morgan County Speedway. Okay, this area is restricted. This area is not. This area is general public. This area is not. That's what could have been done in this case, and it wasn't. They'd leave it to basically the person signing the release to determine it for themselves. I'm asking the restricted area. And the police do make a big point out of the only persons that they saw there had wristbands. That in and of itself shouldn't make that the restricted area. They could have opened up a parking lot and started with wristbands, but the parking lot doesn't. Well, that's kind of a clue, isn't it, at an event? Pardon me? Isn't that sort of a clue, the wristbands at an event? Have you ever tried to go down to the sideline at a college football game? I've never been to a shop, and I'm assuming I'm going to get bumped up. You're not going to make it, even though there are all kinds of openings, because the people down there have credentials. Although I suppose at a baseball game, which a Cardinals game, late in the game when people move down, including myself on a previous occasion. They move down into seats. They don't move down into areas that are restricted from spectators. Right. Because of the very fact there is that security, there is someone there. There are those type of postings. In this case, we don't have that. I do see my light is on, so I want to touch on one other quick area of my mind. That is the discovery in this particular matter. Again, I know it's a smaller point, and it's one of which was not stressed in a sense, but they never responded to the request to produce an interrogatory in this particular case. Appellees point out or try to say that, hey, we didn't raise that before. Well, we did. In letters to them, which obviously aren't for the record, but then in a response to our motion for summary judgment before the trial court, we also say, hey, judge, just put a rule in this. Make them answer the discovery. And it's sort of a, hey, we didn't answer it, but we get to have the victory of the summary judgment. That's not how the trial court, that's not how it's supposed to happen. Maybe the discovery wouldn't have helped us at all. Maybe they wouldn't, but maybe it would have shown that there are 14 other accidents in this area previous to this. They possibly moved a wall, which there's a possibility of ever changing that in some circumstance. That discovery could have helped us on either an amended complaint or other discovery would have taken having a different one than to never have had before this court. So the appellee shouldn't be able to benefit from that. And, again, I know that is a small point. In the overarching thing, we'd still end up talking about the waivers. But that would be for a trier fact to decide.  Thank you. Good morning, Your Honors. My name is Colleen Lawless. I'm here on behalf of the Plaintiff Appellant James Hurley. The first point that I'd like to bring up without having to go through the release again for repetition purposes is that also there's a negligent voluntary undertaking claim that Plaintiff James Hurley has alleged. And that is based on the fact that despite the release in question, that the defendants can still be liable under a negligent voluntary undertaking. And in order to do so, a duty limited to the extent of the undertaking can be imposed on a person that undertakes voluntary agrees to perform a service necessary for the protection of another person. And in this case, the defendants elected in this supposed restricted area to erect the metal fence slash barrier that is the exact same metal fence and barrier that protects the general grandstand area. And to be able to put it in perspective for purposes of Morgan County Speedway, there's three specific areas that the plaintiffs were in on the night in question. There is the restricted pit area. That's where the cars are being serviced, the pit crew. Cars are being in and out. There is absolutely no barrier in between the pit area and the racetrack. The second area would be the grandstand. And that's where you do not have to have a wristband or a general public can go there and view the races. When they're in the general grandstand, it's an elevated area and they're behind a metal fence. Right in front of that exact metal fence and general grandstand area is what we as the plaintiffs and the defendants have termed as the extended grandstand area. And this is where the plaintiffs were at when they were struck by the car. This area is directly below the grandstand area and also has a fence right in front of that. It protects them, it protects the spectators from the racetrack and from anywhere else at that point. This demarcation is a voluntary undertaking. They erected this fence to protect the spectators, to give the spectators another area to be able to view the race from aside from the general grandstand area. In this circumstance, the plaintiffs left the pit area. It was restricted. It had absolutely no barriers and it wanted protection. So they went behind this fence. There were no warning signs in this extended grandstand area. And in that area, there's no warning signs indicating it's a restricted area. There are no warning signs saying this will not afford the adequate protection. The plaintiffs were not put on any notice that that metal fence was not going to protect them the same way as if they were in the general grandstand area. And so under this negligent voluntary undertaking, aside from even the release in question, the plaintiffs still have a claim for the negligent voluntary undertaking against the defendants in this circumstance because they did rely on this fence that was erected for the protection of them. They relied on it and as such sustained serious injuries from it. And under this claim, the first district in, I'm going to butcher this case, Bergeon J, the first district in a situation where the plaintiff was brought to suit against the landlord because under, in her circumstance, there were security lights that were installed for her protection. And as a result of the security lights not working or having a failure of the landlord to tell her that the security lights were not working, she sustained assault, battering, and sexual assault by an assailant. She brought a claim for negligent voluntary undertaking. In her lease, there was an exculpatory clause that stated that there was no responsibility of the landlord for acts of third parties. The appellate court in that situation specifically rejected the defendant's argument that any promise of security was contractually disclaimed. That's the same argument that's being made in this circumstance because the plaintiff's lease, based on the voluntary undertaking, is a separate claim despite the release in question. Now the defendants in the appellee's brief, they didn't really even contest that this is possible. All they said was that the defense in question was not erected for the protection of people. They equated it more to, in the first district case, where there were door buzzers that were also part of the negligent voluntary undertaking claim. The appellate court found the door buzzers were not there for protection purposes. They were actually there for communication purposes. Now that is... So we should come up with a decision that says if you do something in any way that's going to protect people that's otherwise have their litigation barred by an exculpatory clause, then you're just opening yourself up for this sort of claim. Well, that was actually what the holding in the first district... That's what you're asking us to say with regard to this restrict. So the message being, you know, if you got the exculpatory clause, do nothing. It's not don't do nothing. It's that don't do anything that's for the protection of spectators to give them an extra protection. Because you might have some lawyer later on arguing that, gee, it didn't work, and we have an injury here, and you're liable, and you've now essentially abandoned the exculpatory clause which otherwise would apply. I believe that that is appropriate in the circumstance for the plaintiffs in this case. Why is that appropriate when you're talking about a race car track? Because the race car track in the release in question was talking about restricted areas where you would believe that would be the pit area where there are no barriers. There is nothing. So if we can go into that, there are material questions about that. Well, except that the release says restricted area is any area where you need some kind of credentials. And I believe Mr. Cade had also touched upon this. Yes, the plaintiffs have said that they had their wristbands on and that others in the extended grand stand also had wristbands on. How did your client gain access to the area where he was injured? Fifteen minutes before the race, he left the pit area and then went into the restricted area. How? He just gained entry into it. He just walked into it. How? Through, I believe there are two entrances. No, I mean how do you get from the pit area to the opposite side of the track, I presume. Yes. How do you do that? You would walk, I think in this circumstance, he left the pit area, walked towards the east side of the track. Do you walk across the track? You do not walk across the track. You would walk along the track. The track is the inner part of the track and then there's, I don't know. Well, the inner part of the track is the pit area, I presume. No, the pit area is on the outside. On the outside. Yes, it's not the inner part. Okay. Okay, so there's the inner part of the track where the cars are actually racing and then there's a pit area that's on both ends of the track and then on the sides of the track are where the spectators usually watch the race from either the extended grandstand area or the general grandstand area. Where is the area of greatest risk? The area of greatest risk would be in the pit area which are on the sides because there's nothing stopping the cars from entering the pit area. So if I let you into the pit area, you're on your own. If you get run over, that's a problem. Exactly, and you know that going into the pit area. But if you choose to go into another restricted area, I have some greater responsibility toward you? The greater responsibility arises when you build a fence that will provide protection. So Mr. Hurley, the experienced race fan who's your client, went into that area because he thought it would be safer to watch the race from there rather than the pit area? Yes, absolutely, and I believe all of the appellants in this situation have. They all said that? Yes. But it was an extended area that they could go to that was behind a fence which is completely demarcated from what the pit area provides. Okay. Thank you. Thank you. Good morning, court, counsel. I'm the attorney for Matthew Eisenogle. He's the first timer at the racetrack. And to answer Justice Steigman's question earlier, I believe he would be the one that would have turned away from the pit area. Because one thing that was not mentioned yet, 15 minutes before this accident, there was a prior accident over near the pit area where that scared him to where he wanted to get safe and he went over there to that area. The other thing that's also a little bit not bringing out here, my client said that when he went over to the area, nobody checked him coming in. There was a guy at that gate opening checking people going out into the track area but not coming in there. So he walked in there. Next, there was also clothing. It was kind of chilly at night. He didn't know who did or did not have wristbands on. He could not see. There was no signs there, nothing. You look at the waiver itself. The waiver itself is called a pit pass. To my client, it was a pit pass. It actually had a place where he put a car number. To him, a pit pass, yeah, if you're going to be in the pits, it's a dangerous location, of course I'm going to sign a waiver to be there. But once I realize it's dangerous, he takes the extra step to go to an area where the grandstand is, which is a separate, distinct area from where the pits are, goes over there, walks through a gate. He's not told by a guard this is extended. He's not checked for an ID. Maybe it would make sense that on hindsight that maybe if you're coming from the pit area, the guard would know that you have a wristband on. But that was never checked on my client. My client just went through there. They were only checking going out. There was no signage. Like my client said, it didn't say restricted. How would that have made a difference on the release that he sent? It should be up to the drafter to put people on notice where the restricted areas are. It says pit pass, that's a given. But then where else? Where else is restricted? My client had no clue. How did all the people who signed this go over to the grandstand area, what I would call the standing room only in the grandstand area, to be safe? Because it's not near the pits. It's closer to where the rest of the audience is who is deemed to be safe. It's away from the activity of the pit pass. You're not working on cars, you're not racing cars. Did he move into the grandstand? Pardon? Did he move into the grandstand? I think the grandstand was full at that time, which is why I think they went to this area. I think it was like standing room only. But I'm not for sure. But I don't think we got to that point. I think it's a question of fact whether or not these participants knew on that day that this area was a restricted area. How did they know that? Why put them on notice? It should be the drafters of the racetrack who puts them on notice that this is a restricted area. If they're going to outline and say, you are waiving your right to go into a restricted area, then by golly, please tell me where the restricted areas are. Don't make me assume or do investigatory work as to, do you go up to everybody and say, do you have a wristband? Do you have a wristband? Do you go up to track officials and say, is this the area? It should not be their burden to try to figure out where the restricted areas are. If they want to be protected by a waiver, they should go the extra step and say, hey, if we want to be protected by a waiver, we need to put precautions in to let people know, give them notice as to these are the restricted areas. Had they done that, what would have happened? Well, I think if that was done, other than the arguments regarding to the voluntary undertaking and the waiver of the liability, if the waiver of the liability is deemed to be important. So there's a sign that says secure area, now what? Yeah, I think that could have worked. Then what would have happened? What would your client have done? How would it have mattered? Maybe he would have left the whole park. Well, give me a scenario. He was scared. The sign that says secure area, now he knows it's dangerous and he would have left? Yeah, that's what he left the other side for. That's what we'd have to conclude? He had testified he was scared. That accident, this was his first time at a racetrack ever. He was over there. There was an accident. He got scared. He says he got scared. He went across. So why didn't he leave? Because he went to a place that he thought was safe. What sign said? This is a safe place? Is that what the sign said? There's a big wall with a big fence, which did not have one in the pits. I think we're safe here because this is where all the other observers are observing. So if it said secure area, and then it said this is the secure area, then? If it said it was a, what, you mean restricted area? Restricted area. Restricted area. If it said restricted area, it was never asked whether or not he would leave, but I think he probably would have left. But that's something that can be asked at trial, and that would give him, should he have been put on notice, that that area was restricted. If it was, because we're speculating, yes, if they would have done their job right and had a sign up there, maybe, then he would have been out of luck if he would have stayed. Thank you. Thank you. If it please this court and counsel, my name is Karen Kendall, and today before this court, I represent a number of defendants involved in putting on races in Morgan County. Back in 1980, this court decided Schlesman v. Hanson. That case also involved a racetrack injury in Champaign County. Justice Greene authored the decision. In that case, this court upheld the release and waiver. In that case, the embankment of the track where there's a turn collapsed. That case went to the Illinois Supreme Court. The Illinois Supreme Court affirmed this court's decision and observed in very strong language that automobile racing is a high-risk, dangerous activity and that the collapse of an embankment was just a foreseeable risk that was included in the release. A number of decisions since that time have accepted the wisdom of this court's decision in Schlesman and also the Illinois Supreme Court's decision. Before we get into those cases, though, I think it's important to look at the language of this release and waiver, which the plaintiffs really don't want to talk about at all. As Justice Steigman was pointing out earlier in questioning, the release itself says, in consideration of being able to participate in any way, including observe, or being permitted to enter for any purpose any restricted area, the person who signs it agrees to inspect for safety, leave if he feels it's unsafe, agrees not to sue and indemnify, agrees to assume risk of bodily injury and death, acknowledges that these activities are very dangerous and involve the risk of serious injury. And at the end, it says, I have read the agreement, fully understand it, understand I have given up substantial rights by signing it, and I have signed it freely and voluntarily without any inducement, assurance, or guarantee. It's a complete, unconditional release of all liability. In order to allow high-risk recreational activities, entities like Morgan County have to have releases. The other side of that would be that if we can't protect an entity, a public entity such as Morgan County, from liability, we wouldn't have these high-risk recreational activities, such as automobile racing. In our brief, we discussed a number of cases, including Cook v. Spalding, a 1988 5th District case, Rudolph v. Santa Fe, a 1st District case in 1984, and a number of other cases which are important because they've addressed the specific arguments raised by the plaintiffs here today and found them not to be a basis for refusing to apply and uphold the validity of the release. We cited to this court as additional authority the most recent case on this, Hellwig v. Special Events. Now, that didn't involve automobile racing. It involved bicycle racing, cycle racing on a closed course. And in that case, the person was injured by a non-participant who happened to fall into the course. And they said, well, this isn't part of the release. But the court said, no, that's also part of the release. Whether it's ski racing, bicycle racing, automobile racing is one of many people's favorite sports. But no matter what it is, that's a situation where the courts have found no reason to refuse to uphold the release. We have the signatures here. They don't deny that they signed it. They don't deny they had the opportunity to read it. Mr. Hurley, we heard from his counsel, apparently there's some contention they didn't know this particular area was part of the restricted area. First of all, as Mr. Hurley freely acknowledged, the reason they signed this release is because they want to go into the restricted areas. That's why they did it. So Mr. Hurley himself had been at the racetrack over 100 times. He always signed a paper, got a wristband, and said that, yes, I could never go into the restricted area, the extended grandstand, without an official checking both ways. Mr. Baker is the same way. In order to be able to gain access to any restricted area, including the pit area, the parties have to sign this release. The parties are free to make their own decisions. They're free to leave. They're free not to participate. They're free to decide they don't even like automobile racing. In this instance, we have the releases that were signed by these entities, these individuals, because they wanted to enter the restricted area. What about the voluntary undertaking argument that was made by Ms. Lawless? Well, Your Honor, I think that's an extremely creative, very long stretch to try to get around a release. First of all, it's still negligence. I mean, it's still a claim of negligence. And what that release, our release, covers is any type of negligence. So I don't even see how rationally it would preclude. But additionally, I certainly don't think we want to establish a principle that says that any time we erect a fence or have a cement wall or any kind of barrier at all, that that invalidates a release. It's not a rational statement. So if I understand you correctly, you're saying that at worst, this would be a matter of negligence itself, the voluntary undertaking, and that's still covered by the same release, which is your claim to absolve the defendant of negligence in the first place? Right. What if these folks had left the pit area where, obviously, they understood they were signing a release because the pit area is very dangerous, cars in and out, boom, boom, boom, boom. And instead of going to the, quote, extended grandstand area, they went into the fourth row of the grandstand and took a seat. And a car went flying over the fence and squashed them, all right? What's the effect of their release under those facts? Well, if the release only addresses restricted areas and the grandstand, which is open to the general public, is not a part of the restricted area, I would say that the release doesn't apply. So the question is, how do we know whether the extended grandstand is a restricted area? Well, Mr. Hurley and Mr. Baker certainly understood that. Well, I don't. Because in order to get in, there's a fellow here checking to see if you've got your wristband on. They knew that they bought the wristband and signed the release and paid extra money so that they could enter the restricted areas. And they also knew that the restricted areas were the high-risk areas, such as the pit area. So that's how they knew. I agree, as far as I know, there wasn't any sign-up that says you are now entering a restricted area. But they knew that they could only get in because they had that wristband there. I'm sorry, I walked away from the mic. Oh, no, that's okay. But that really doesn't answer the question I've got in my mind. I mean, I've been to a lot of county fairs in my life. I haven't. You haven't run for the appellate court. Oh, yes, I did. I just didn't get through the primary. But, you know, most county fairs have a grandstand, whether it's for horse racing, car racing, whatever. And the grandstand would front one side of the oval. And all the way around the rest of the area is open. And I agree a guard was there for people coming out of the pit area into the extended grandstand. That's not really the testimony, Your Honor. The testimony from Mr. Hurley and Mr. Baker is that there was a guard checking for admission into that area. Mr. Eisenogle, who says he had never been to a racetrack before, is the only person who says that he thought, well, first of all, he says people had long clothes on, so he didn't look around to see if anybody had a wristband on. And then he said he thought they were only checking when they left. But that's not what Mr. Hurley and Mr. Baker said. They said that they knew that they were being checked in order to enter the extended grandstand area. And it's very clear in this record. The trial judge wasn't confused about what the facts are before the court. But if you got a ticket to the grandstand, no release, right? I don't know that. I mean, I honestly don't know whether your ticket on the other side says you understand this is dangerous. I think the way the issue is set up is that if you bought a ticket to the grandstand, no pit area, no special access, no restricted area access, just you're going to go watch cars go around the track. No release there. But if you're sitting in the grandstand, as I understand it, you could walk down to the first row of the grandstand and then exit either right or left and stand by the fence from the grandstand. You would have access to the, quote, extended grandstand from the grandstand. Is that correct? You could not enter the extended grandstand area without a wristband. So there was a guard at either end of the grandstand. I don't know. I mean, I can't remember the testimony of Baker and Hurley as to where they entered it, but they were both consistently saying that they knew that in order to enter the extended grandstand area. Because they had some relatives there who didn't pay the enhanced fee, didn't get a wristband, and in order to talk to those relatives, they had to go up to the general grandstand area. But do you think that could be important if the people who did not sign a release paid their $10 for a regular ticket and walked down the grandstand to the bottom level and went out to one of the sides to stand by the fence and watch the race? I may not be visualizing, you know, due to my lack of experience, but I do think that, and I hope this is somewhat responsive, I do think the testimony in the record is very clear that everybody understood that the area where the accident occurred was a restricted area. It was restricted by having to pay the enhanced fee in order to obtain the wristband and sign the release. I'm not sure I understood your response about how they had to go up to the grandstand to talk to relatives. Yes. Is that walking up to it to yell to them, or were they just in and out? One of the witnesses, and I can't remember whether it was Mr. Baker or Mr. Hurley, went to eat with his wife, you know, went out of the restricted area, went and bought a hot dog or something, went to where his wife was sitting in the grandstand and had his meal with her, and then left and returned to the restricted area. She could not come to where he was, but he could go to where she was. Well, because when he left to join her, then to come back in he had to go through this guard again or whatever it was? Yes, he had to have a wristband to return to the restricted area. Was there some testimony about some area permitting free flow back and forth where there was no guard chucking wristbands? I don't believe that. I don't believe there was any reliable testimony that said that. Was there any testimony? Well, Mr. Eisnogel, he, well, first of all, he said that he didn't know whether people had wristbands on or not. And then he said that he thought that you had to have them when you left, but you didn't have to have them to come in. And the people who had been at the racetrack a hundred times, like Mr. Hurley said, you had to have a wristband in order to enter the area where the accident occurred. As this court did in the Schlesman case, we would ask this court to affirm the judgment of the trial court. Parties have to be free to contract away their liability. Parties have to be free to engage in high-risk recreational activities should they choose to. Entities like Morgan County can put on such activities by virtue of valid and enforceable releases. We ask this court to affirm the judgment of the trial court. Thank you. Rebuttal? Yes, I'll start. Again, shared? Shared, on behalf of the board, myself, and counsel. Very briefly, I'm going to start exactly where Justice Appleton left off, which was the entire point of our case in regard to the division of the extended grandstand area and the grandstand area. I think that Ms. Kendall's recollection of the depositions as being so very clear is not correct. I think you can look at both my client's deposition transcript and his testimony, and the deposition was, yes, there was a guy standing there, but he wasn't checking anything. Remember, Mr. Baker had previously been down in the pit area, working on a pit crew, participating in the race, of all the things that this type of way will recover, leaves that area. That area definitely is restricted. You have people in and out you have to show and all that kind of stuff. Leaves there, no problem, nobody's doing anything. He does acknowledge there's a guy standing over there toward the opening. Again, it's an opening about the width of this lectern. He's standing, and I believe the testimony was, what's that guy doing? Watching the races. He's not doing anything. People that have been to Tyson County Fair know what's going on. There's a guy standing there. He's fucking with the races. Mr. Baker leaves the pit area. He's done working. He wants to just watch the races now. So you're suggesting then that anyone could just walk in there without any wristband or paying anything? Quite possibly at that point. I mean, when he's leaving, because his races are done. Is that the point of the argument? Yes, Judge. I believe that's correct. I mean, I think at this point in the race, possibly early on, maybe there was a guy doing a better job. Okay, in and out, you've got wristbands, you don't. But this is later on. So it's a question of, had he been checking wristbands, then you lose. Is that the whole point? That would be, Judge. Why does that matter on the basis of the exculpatory nature of the release? Great point. That's the restricted area. Now you know. You talked earlier about a sign. Sign wasn't necessary. Person doing it. Anything showing off that, where is the restricted area at? And just as that, in and of itself, maybe they do win the day. But that's a question of fact. That's not a summary judgment. And that's the point of it. And again, and the only other point I wanted to bring up before deferring to counsel, is that again, on the release and waiver, at the very bottom of it, it talks about duties. Well, if you're looking at this release as a whole and everything, and if you're simply a spectator or someone at that point who's, what the heck's your duty? You don't have a duty in the race. That's why you'll see all these sorts of weird answers. Some people put car numbers down. Some people check a box. Some people put their address. That's the part of it. I mean, that's not them to do this appropriately. That doesn't make sense. That makes sense for somebody working out of the pit crew. Sure it does. Absolutely. Mr. Baker, when he was down in a pit area, that makes sense. But not when you're up just viewing the race in front of the grandstand. I'll defer to counsel for their major geography. To expand on Mr. Cates' question of fact statement, is that Mr. Hurley, as the defendant has tried to allege, that Mr. Hurley knew that he was signing that release, that it was a release, that he was signing it to get into the pit area and to go into restricted areas. That is absolutely not the testimony of Mr. Hurley. Mr. Hurley specifically testified that he did not even see the language of the release, that he was only provided with the signature lines akin to like an election petition. That he didn't see any of the language. He was not then given an opportunity to read the release or even contemplate or understand what this restricted area is. Yes, he had been to races many times before, and I do believe he stated 100 times before, except he specifically stated that the reason he believed he was signing that line was to show he had proof of insurance. He said insurance is expensive, so I had to show proof of insurance. To agree with you, do we have to overrule the Schlesman decision of the Illinois Supreme Court? No, I do not believe this is similar to the Schlesman case. In Schlesman, that was a participant in the race. The plaintiff was actually driving his car when an embankment fell. And the court specifically stated that experienced race car drivers are aware of the risks attended in race car driving. But your client wasn't aware of the risks? No, he was not aware of the risks of a car leaving a racetrack, going all the way into the grandstand area. He had actually specifically testified that prior to the night in question, he had never seen a race car leave a racetrack and go into the grandstand area. By the way, I wanted to ask you about Ms. Kendall's response to the voluntary undertaking. She says, well, even if that is negligent, the release covers that too. Why isn't she right? Because the negligent voluntary undertaking claim is separate and distinct from what the release in question is stating. And that was held in that First District case that I had cited to and that the defendants have not provided any other... They didn't hold that in that case. They just said voluntary undertaking was a different matter. They didn't hold that there was even a voluntary undertaking in that case, did they? Yes, they did find that the security system was a voluntary undertaking, and that by doing so and that he negligently undertook putting in the security system, that he can then become liable for any injuries that occur based on the plaintiff relying on that undertaking. And in that case, there was a release with an exculpatory clause specifically stating that the landlord was then not going to be held liable for any acts of third parties. This was an act of a third party that it did happen. So arguably, under Ms. Kendall's argument, then it should have been included under that lease exculpatory clause, similar to our release in question, except the court specifically rejected that argument and stated that when a landlord goes above and beyond and actually pursues and provides protection in a circumstance like a security system or in this circumstance, a metal fence that's a wall and fence that's specifically the same as the general grandstand area, when you afford that protection, you can't do it negligently. And that if you do that, it negates the release in question and then goes under the negligent voluntary undertaking claim. Thank you, Your Honor. We take the matter under advice.